**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | |
|---|---|
| **MAERSK LINE, LIMITED,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.  2:22-cv-370** |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

For its complaint against the United States, Plaintiff Maersk Line, Limited ("Maersk") states as follows.

## SUMMARY

1. Maersk brings this action to challenge three final decisions of a Contracting Officer ("CO") of the United States Transportation Command ("USTRANSCOM") each dated September 3, 2021 (the "COFDs"), the failure of the Defense Logistics Agency ("DLA") contracting officer to address Maersk's claims submitted to it, and various contract breaches by the USTRANSCOM and the DLA.

2. In the COFDs, the CO denied Maersk's certified claims for payment of delay charges based on his erroneous determination that the claims lack legal and factual bases. USTRANSCOM's contention that it has no duty to pay Maersk for delay charges or to cooperate with and assist Maersk's efforts to resolve its claims with the Government's (*i.e.*, DLA's) contractors for whom Maersk transported goods pursuant to their Prime Vendor contracts with DLA (the "Prime Vendors" and the "PV Contracts") and DLA's refusal to address these concerns

1

is in breach of Maersk's Universal Services Contracts ("USC Contracts"), the PV Contracts, and the Government's duty of good faith and fair dealing implied in all the contracts.

**PARTIES**

3.       Maersk is a United States-based subsidiary of Maersk Agency U.S.A., Inc., which is wholly owned by Maersk A/S, a Danish company, and its parent company, A.P. Moller Maersk A/S, also a Danish company. Maersk is headquartered in Norfolk, VA. Maersk manages the world's largest fleet of international trading U.S.-flagged vessels.

4.       The United States, acting through USTRANSCOM and DLA were and are responsible for awarding and administering the USC Contracts and PV Contracts, respectively.

**JURISDICTION**

5.       The Court possesses exclusive jurisdiction over this maritime contract dispute pursuant to 46 U.S.C. § 30903 (Suits in Admiralty Act) and 28 U.S.C. § 1333. *See also* 41 U.S.C. § 7102(a) & (d) (Contract Disputes Act ("CDA")) (directing that CDA appeals of maritime contracts are governed by the Suits in Admiralty Act).

6.       This action is timely commenced: (i) within 12 months of Maersk's  date of receipt of three USTRANSCOM contracting officer final decisions issued on September 3, 2021 pursuant to 46 U.S.C. § 7103(d), (e) & (f), regarding Maersk's contract claims (certified as appropriate), 41 U.S.C. § 7103(a) & (b), submitted under two USC Contracts; (ii) to pursue the failure of a DLA contracting officer to address or to issue any final decisions on the same three certified claims submitted to the DLA as a third party beneficiary under the DLA PV Contracts recognized in the USC Contracts, 46 U.S.C. § 7103(f);  (iii) to pursue Maersk's contact rights as an explicitly designated third-party beneficiary under the DLA PV Contracts; and (iv) to pursue its rights for

recovery under USTRANSCOM's and DLA's breaches of the duty of good faith and fair dealing owed to Maersk.

7.      The USC Contracts each involve the United States' procurement of international ocean transportation and associated intermodal distribution services between the United States and various overseas locations and whose principal objective is maritime commerce.

8.      Under the Subsistence Prime Vendor Program, DLA contracts with private full-line food distributors through PV Contracts to procure and deliver food and food-related items across the globe for DLA's military customers. The PV Contracts require the suppliers to ship their contracted-for supplies through the Defense Transportation System ("DTS") which utilizes the USC Contracts for the transportation of the goods overseas. A principal objective of the PV Contracts is maritime commerce. The PV Contracts specifically reference USC carriers (such as Maersk) as intended third-party beneficiaries: "[T]he USC carrier(s) is an express third-party beneficiary of the provisions of this contract governing the liability of the PV for container detention, port storage, refrigerated container maintenance, etc."

## VENUE

9.      Venue is proper in this Court pursuant to the Suits in Admiralty Act, 46 U.S.C. § 30906(a)(1), considering Maersk has its principal place of business located within Norfolk, VA.

## FACTUAL BACKGROUND

### The USC Contracts

10.     Through its USC Contracts, USTRANSCOM contracts for cargo transportation and distribution services using regularly scheduled commercial liner service for requirements that may arise in any part of the world. Ocean transportation is the principal purpose of the USC Contracts,

but carriers also are required to provide ocean, intermodal, and related transportation and distribution services to support their offered services.

11.     The USC Contracts  are primarily for requirements sponsored by the Department of Defense ("DoD"), but also include transportation of government-contracted-for items, which includes transportation of  Prime Vendor's cargo in support of the DLA Subsistence Prime Vendor Program.

12.     Maersk's claims seek compensation for Container Detention, Driver Wait Time, Port Storage, and Reefer Maintenance charges associated with carrier services provided under the USC Contracts. Each of these charges result from unanticipated delays not within the control of Maersk as the carrier while cargo was being transported within the DTS pursuant to the USC Contracts while Maersk was transporting government contracted PV cargo under the PV Contracts. In each instance, DLA placed the orders for Maersk to transport the Prime Vendor's cargo under the PV Contracts.

13.     On September 1, 2012, USTRANSCOM awarded contract number HTC711-12-D-W013 (the "USC-7 Contract") to Maersk for ocean and intermodal distribution services. The period of performance ran from September 2012 through August 2015. The purpose of the USC-7 Contract was to have DTS cargo delivered around the world using ocean common or contract carriers, offering regularly scheduled commercial liner service for requirements in any part of the world, with contractors expected to provide ocean, intermodal, and related transportation and distribution services to support their offered services. The USC-7 Contract was intended primarily for requirements sponsored by the DoD, to include, among other things, items contracted for by DOD such as shipments from commercial entities for use by DoD (*e.g.*, DLA's Subsistence Prime Vendor Program).

14.    On March 1, 2016, USTRANSCOM awarded Contract No. HTC711-16-D-W014 (the "USC-8 Contract") to Maersk for ocean and intermodal distribution services. The period of performance ran from March 2016 through February 2019. The terms and purposes of the USC-8 Contract were essentially similar to those of the USC-7 Contract as described in paragraph 13.

15.    Both contracts authorized payment to Maersk for compensable delays for certain situations:

(i)    Situations where the U.S. Government Causes a Delay;

(ii)    Situations where neither the Contractor nor the U.S. Government Causes Delay, as follows:

a. The subject delay is caused by an extraordinary event not within the control of either the U.S. Government or the Contractor. An extraordinary event is uncommon or unusual and beyond the control of a reasonable Contractor exercising customary foresight and sound business practices; and

b. The extraordinary event is otherwise not compensable under other provisions of this contract;

and

c. The extraordinary event interferes with or prevents performance of a contractual obligation by a reasonable Contractor; and

d. The Contractor has exercised due diligence to mitigate the delay or the financial consequences of such delay; and

(iii)    In declared Exigency Areas, which included Iraq and Afghanistan for the USC-7 and USC-8 Contracts,  the scope of the compensable delay available to the contractor was broadened to the extent that action or inaction by any government, not just the U.S.

Government, delays Contractor performance in a declared Exigency Area or at the border of a declared Exigency Area.

16.     Both the USC-7 and USC-8 Contracts also included special provisions for  the shipment of PV Cargo for the DLA. They required Maersk and the Prime Vendor to first endeavor to resolve between themselves disputes about loss/damage to cargo and compensation due the USC Contractor for detention of carrier containers, for port storage, for reefer maintenance, and other matters.

17.     USTRANSCOM included in both contracts provisions asserting that for delay claims involving the PV Contracts and the movement of PV cargo, the Government would not agree to Government liability for USC Contractor claims for detention of USC Contractor equipment; for port storage charges (*e.g.,* while cargo delayed through fault of Prime Vendor or request of Prime Vendor); for trucker wait time (*e.g.,* while cargo delayed through fault of Prime Vendor or request of Prime Vendor); for reefer maintenance (*e.g.,* while reefer in custody of Prime Vendor); or, for cargo delayed if through the fault of the Prime Vendor or at the request of the Prime Vendor.

18.     The Government insisted that the USC Contractor first submit to the Prime Vendor, with copy to the USC Contracting Officer, any claim for damage, detention, port storage, or reefer maintenance, as applicable. If the USC Contractor was unable to communicate directly with the Prime Vendor, the USC Contractor was to advise the USC Contracting Officer. In those instances, or instances where the resolution of Prime Vendor / USC Carrier claims reached an impasse, the USC Contracting Officer was to function (in coordination with other Government agencies as appropriate) as a facilitator in order to bring the parties together and work towards resolution of the claim(s).

19.     USC-7 and USC-8, however, both established that the Government is ultimately responsible for addressing Maersk's PV claims if they could not be resolved between Maersk and the Prime Vendor:

> the USC Contractor may pursue any rights it may have under this contract and may file a claim with the USC Contracting Officer where allowable under the terms of this contract in connection with the transportation of Prime Vendor cargo. An example of such a situation could be where Government action harms the USC Contractor with respect to Prime Vendor cargo transportation and some other part of this contract provides a remedy.

### The PV Contracts

20.     Headquartered at Fort Belvoir, Virginia, the DLA is a 10 U.S.C. § 193 combat logistics support agency for the DoD, Army, Navy, Air Force, Marine Corps, Coast Guard, and other federal agencies. DLA maintains several Major Subordinate Commands (MSC), including DLA – Troop Support, located in Philadelphia, PA. DLA – Troop Support manages DLA's supply chains for food, textiles, construction material, industrial hardware, and medical supplies and equipment.

21.     Under the Subsistence Prime Vendor Program, DLA contracts with private full-line food distributors in order to utilize commercial infrastructure to procure and deliver food and food-related items across the globe for DLA's military customers.

### Anham PV Contracts Under The USC-7 Contract

22.     DLA entered into contracts Prime Vendor contract nos. SPM300-10-D-3373 (deliveries to Iraq, Kuwait, Jordan) and SPM300-12-D-3571 (deliveries to Afghanistan) (collectively, the "Anham PV Contracts") with ANHAM FZCO, LLC ("Anham") for supply of various commodities to U.S. Government agencies. The Anham PV Contracts provided subsistence products to the U.S. military and other federally funded customers within Afghanistan, Iraq, Kuwait, and Jordan.

23.     The Anham PV Contracts require the supplies provided under the contract to be shipped through the DTS, such as through the USC-7 or USC-08 Contracts. The DLA books shipments with a USTRANSCOM carrier such as Maersk to arrange delivery to the Prime Vendor's overseas facility. The USTRANSCOM carrier transports the supplies through the DTS system from the United States to the Prime Vendor's overseas destination.

24.     DLA placed orders for Maersk to provide international transportation under the USC-7 for some of Anham's shipments under Anham's PV Contracts.

25.     The Anham PV Contracts required the Prime Vendor to enter into separate agreements with the USTRANSCOM carriers ("PV Carrier Agreements"). The PV Carrier Agreements are expected create a minimal process for claims processing and dispute resolution to resolve, among other things, the USTRANSCOM carrier's claims against the Prime Vendor for detention of carrier containers, port storage, and reefer maintenance provided by a carrier for detained refrigerated containers. The Prime Vendor is expected to pay the USTRANSCOM carrier for detention, port storage or reefer maintenance charges incurred by the USTRANSCOM contractor for which it is responsible. It does not mandate that the Prime Vendor pay the USTRANSCOM carrier for delays for which it is not responsible.

26.     The USC-7 and USC-8 Contracts and the Anham PV Contracts prescribe that the USC carriers are intended third-party beneficiaries of the PV Contracts. For example, the SPM300-12-D-3571 Contract prescribes: "[T]he USC carrier(s) is an express third-party beneficiary of the provisions of this contract governing the liability of the PV for container detention, port storage, refrigerated container maintenance, etc."

### *Anham PV Contracts Under The USC-8 Contract*

27.     DLA's Anham PV Contracts (SPM300-10-D-3373  and SPM300-12-D-3571  also applied to Anham's supply of various commodities to U.S. Government agencies for which Maersk provided shipment under the USC-8 Contract. The same Anham PV Contract terms applied to Anham under the USC-8 Contract as they did for the USC-7 Contract.

### *Anham PV Carrier Agreements With Maersk Under PV Contracts*

28.     Maersk and Anham entered into a PV Carrier Agreement on March 9, 2013 which was subsequently renewed in January 2016 in connection with Anham's PV Agreements and the USC-7 and USC-8 Contracts. The PV Carrier Agreement established a dispute resolution process for addressing, among other things, the resolution of Maersk's claims for detention of carrier containers, port storage, and reefer maintenance provided by it for detained refrigerated containers consistent with the USC-7 and USC-8 Contracts terms.

29.     The PV Carrier Agreements required Maersk to submit claims for delay charges to and to address them with Anham. The PV Carrier Agreement stated that the parties acknowledged that the USC Contracts and the PV Contracts "generally preclude government liability" for Prime Vendor caused issues, explaining that certain claims were to be resolved directly between the USC Carrier and the PV:

> USC Contractor claims against a Prime Vendor for port storage charges (e.g. while cargo delayed through fault of Prime Vendor or request of Prime Vendor); USC Contractor claims against a Prime Vendor for trucker wait time (e.g. while cargo delayed through fault of Prime Vendor or request of Prime Vendor); USC Contractor claims against a Prime Vendor for reefer maintenance (e.g. while reefer in custody of Prime Vendor, or cargo delayed through fault of Prime Vendor or request of Prime Vendor)".

30.     The Government's limitation or exclusion from liability, however, was not absolute and did not preclude Government liability to the USC Carrier for Government-caused delay, or

third-party delays in exigent areas. The PV Carrier Agreements also incorporated the USC Contracts into the PV Carrier Agreements.

31.     Maersk delivered numerous shipments for Anham regarding its PV Contract shipments from the United States to Anham's overseas locations under its the USC-7 and USC-8 Contracts. In doing so, Maersk encountered delays for container detention, port storage, and reefer maintenance, and other matters.

32.     Consistent with the PV Carrier Agreements and the USC-7 and USC-8 Contracts, Maersk submitted its invoice claims to Anham for resolution.

33.     Maersk and Anham worked extensively together to resolve the USC-7 and USC-8 Contracts claims for months. Maersk also sought the assistance of USTRANSCOM and DLA of which none was forthcoming. USTRANSCOM took the position that Maersk could not submit invoice claims to it for delay charges unless it had vetted the claims through the process with Anham and then provided to USTRANSCOM Anham's documented rationale for denial of responsibility and furnished sufficient supporting documentation to support that position. USTRANSCOM also directed that if the Prime Vendor denied liability and Maersk disagreed, then it should seek assistance from DLA to use its resources for assistance in resolving the issue. During 2017, Maersk repeatedly sought a meeting with USTRANSCOM personnel and DLA personnel to address these issues. No formal meeting ever occurred and neither agency ever assisted Maersk or Anham in their efforts to mutually resolve responsibility for the delay (and other) claims.

### Maersk's USC-7 Claim

34.     Maersk submitted charges to Anham under the USC-7 Contract for $606,220.70. In its review of and efforts with Maersk, Anham accepted responsibility for some of the claimed amounts. Anham denied responsibility for some of Maersk's claimed delay costs because it could

not determine the cause for some of the delays. Anham rejected $387,629.29 of Maersk's claims. Upon information and belief, understanding that it did not cause the delays, Maersk believes that the delays and expenses resulted from the actions by government or other third parties or Government's mismanagement of the PV process.

35.    Based upon Anham's denial of responsibility for some of Maersk's claimed costs under the USC-7 Contract, Maersk asserted a certified claim to the Government (USTRANSCOM and DLA) for payment of $387,629.29 or agency assistance in otherwise resolving the disputed amounts, pursuant to the USC-7 Contract and FAR 52.212-4(d) and under its third-party beneficiary rights under the PV Contracts.

### *Maersk's USC-8 Claim*

36.    Maersk submitted charges to Anham under the USC-8 Contract for $1,060,622.14. In its review of and resolution efforts with Maersk, Anham accepted responsibility for some of the claimed amounts. Anham denied responsibility for some of Maersk's claimed delay costs because it could not determine the cause for some of the delays. Anham rejected $748,402.32 of Maersk's claims. Upon information and belief, understanding that it did not cause the delays, Maersk believes that the delays and expenses resulted from the actions by government or other third parties or Government's mismanagement of the PV process.

37.    Based upon Anham's denial of responsibility for some of Maersk's claim under the USC-7 Contract, Maersk asserted a certified claim to the Government (USTRANSCOM and DLA) for payment of $748,402.32 or agency assistance in otherwise resolving the disputed amounts, pursuant to the USC-8 Contract and FAR 52.212-4(d) and under its third-party beneficiary rights under the PV Contracts.

***USTRANSCOM Erroneous Denials of Maersk's Anham Claims Under The USC-7 and USC-8 Contracts***

38.     Maersk's claims under both the USC-7 and USC-8 Contracts were essentially similar other than the specific charges under each contract and the amounts of the respective claims. Maersk established in its claims that the neither the USC-7 Contract nor the USC-8 Contract required Maersk to bear the cost of delays for which it was not responsible but for which neither it nor the Prime Vendor could ascertain and provide documentation establishing the responsible party. It also established that it had exhausted the claim process required of it under the USC-7 and USC-8 Contracts and the respective PV Carrier Agreements. It also established that where a Prime Vendor denied liability but could not prove the negative by establishing who was the cause of a delay, the Government was best placed to determine responsibility considering its overall control of the entire process for ordering and shipping the PV supplies involved. It also established that considering the exigent circumstances and exigent areas through which shipments had to pass or into which they had to be delivered, it should not be necessary to ascertain the specific responsible party especially when foreign governments and other third parties were involved. It also established that the Government refused to provide substantive assistance in resolving the claims situations. Under the circumstances, Maersk established that the Government––USTRANSCOM  and / or DLA—was in breach of its obligations to Maersk to pay Maersk the amounts claimed or to assist it in determining responsibility for payment of the delay charges owed to Maersk.

39.     On September 3, 2021, the USTRANSCOM CO issued two separate final decisions denying Maersk's Anham-related claims under both the USC-7 and USC-8 Contracts in their entirety.  (Attachment 1 – USC-7 claim; Attachment 2 – USC-8 claim) The CO's reasoning in his final decisions was essentially the same for both contracts. The CO asserted that USTRANSCOM

had no legal obligation to pay Maersk's claims; that Maersk had not fully followed the mandated claim resolution process for resolving its delay charges claims with Anham; that Maersk had failed to prove in its submissions and documentary support that the Government was responsible for the delays; and, that Maersk's submissions failed to prove the amounts claimed were owed by the Government. It also asserted some of Maersk's claims under the USC-7 Contract were too old to be considered, although Maersk had established that they were timely asserted because its claim against the Government accrued only when Anham denied its claims giving rise to a claim against the Government.

### *Valiant's PV Contracts Under the USC-8 Contract*

40.      DLA entered into PV Contract nos. SPM300-12-D-3595, SPE300-17-D-4027, SPE300-18-D-4042 and SPE300-19-D-4048 (collectively, the "Valiant PV Contracts") with Nova Global Supply and Services LLC d/b/a Valiant Integrated Services LLC ("Valiant") for supply of various commodities to U.S. Government agencies. Like the Anham PV Contracts, the Valiant PV Contracts provided subsistence products to the U.S. military and other federally funded customers within South West Asia including, among other places, Djibouti. The Valiant PV Contracts require the supplies provided under the contracts to be shipped through the DTS, such as through the USC Contracts.

41.      DLA placed orders for Maersk to provide international transportation under the USC-8 Contract for some of Valiant's shipments under Valiant's PV Contracts. The terms of the Valiant PV Contracts were essentially similar to the Anham PV Contracts.

*Valiant PV Carrier Agreement With Maersk*

42.    Maersk and Valiant entered into a PV Carrier Agreement on February 1, 2017 in connection with Valiant's PV Agreements and the USC-8 Contract. The terms were essentially similar to the PV Carrier Agreements between Maersk and Anham.

*Valiant's USC-8 Claim*

43.    In this instance, Maersk encountered a delay with a shipment involving 12 containers which were detained during September 2018. Maersk submitted a detention invoice to Valiant for compensation at contractual detention rates.

44.    With the exception of one claimed day,  Valiant denied responsibility for Maersk's claimed detention charges on the basis that all delays occurred prior to Valiant receiving the cargo. The delays resulted from Djibouti's customs clearance system while the cargo was still under custody and control of Maersk. Without the assistance of Valiant as the Prime Vendor and the Government, Maersk lacked sufficient information to determine ultimate responsibility for the delays as between the parties and did not have the ability to determine the free time allocation between the Government and Prime Vendor.

45.    For each of the container movements, the Government had approved extensions of the required delivery date ("RDD") via its Delay Request and Authorization Portal ("D-RAP") process. According to the terms of the USC-8 Contract, customs delays (approved through the D-RAP process) satisfied the four required conditions for an equitable adjustment, as follows:

> a. The subject delay is caused by an extraordinary event not within the control of either the U.S. Government or the Contractor.  An extraordinary  event is uncommon or unusual and beyond the control of a reasonable Contractor exercising customary foresight and sound business practices; and

b. The extraordinary event is otherwise not compensable under other provisions of this contract;

and

c. The extraordinary event interferes with or prevents performance of a contractual obligation by a reasonable Contractor; and

d) The Contractor has exercised due diligence to mitigate the delay or the financial consequences of such delay.

46.     Under the circumstances, Maersk was entitled to an equitable adjustment for these delays even if they were caused by third parties, natural causes, or any cause other than those within the control of either the Contractor or the U.S. Government. They also would be entitled to an adjustment if caused by the Government.

### *USTRANSCOM's Erroneous Denial Of Maersk's Valiant Claim Under The USC-8 Contract*

47.     Based on Valiant's denial, in September 2019, Maersk submitted a request for equitable adjustment ("REA") to USTRANSCOM for payment of the delay charges, in the amount of $9,030.00.

48.     USTRANSCOM denied the REA. It recognized that  Maersk's submissions were all accurate. Although it acknowledged that the Government had approved delivery extensions in the D-RAP system as government-caused delays, it asserted that was insufficient to establish the delays were compensable. USTRANSCOM asserted that Maersk's submissions did not explain the circumstances of the delays or provide information to identify the root causes of the delays. It insisted that Maersk provide a detailed narrative for the agency to fully evaluate and understand where the delays were caused, and if those delays were at the fault of the PV, Maersk, or the Government.  When Maersk could not provide such support, USTRANSCOM denied the REA.

49.     Maersk submitted a written claim to the CO during March 2021, seeking payment of $9,030.00 for the delays it had incurred. It relied upon the information that it had previously submitted with the REA, considering it could not locate any additional information about the delay. In addition to seeking payment, it sought, in the alternative, mediation to determine responsibility for the delay. In doing so, Maersk sought to involve DLA considering Maersk's status as a third-party beneficiary under the DLA PV Contract. It explained that when Prime Vendors book cargo with carriers through DLA, they are doing so in the fulfillment of their obligations under their PV Contracts with DLA. Likewise, when Maersk accepted PV cargo, it did so in fulfillment of its obligations under USC-08. This interdependence between the two contracts is expressly acknowledged in the respective contracts by TRANSCOM and DLA. Both of the contracts facilitate the Prime Vendor's fulfillment of their obligations under the PV Contracts by utilizing the carriers' services under their USC contracts with TRANSCOM. Under the circumstances it was incumbent on DLA to be part of the resolution process.

50.     On September 3, 2021, the USTRANSCOM CO issued a final decision denying Maersk's claim under the USC-8 Contract in its entirety. (Attachment 3 – USC-8 claim) The CO's reasoning in his final decision was essentially the same as it was in denying Maersk's claims regarding the Anham delays. The CO asserted that USTRANSCOM had no legal obligation to pay Maersk's claims; that Maersk had not fully followed the mandated claim resolution process for resolving its delay charges claims with Anham; that Maersk had failed to prove in its submissions and documentary support that the Government was responsible for the delays; and, that Maersk's submissions failed to prove the amounts claimed were owed by the Government. The CO also declined the opportunity to engage in mediation or involve DLA.

## CLAIMS FOR RELIEF

### COUNT 1
### BREACH OF CONTRACT

51.     Maersk incorporates each and all of the allegations set forth in paragraph 1-50 by reference as if they were set forth fully herein.

52.     The USC-7 and USC-8 Contracts established the respective obligations of the United States and Maersk regarding Maersk's transportation of goods for the United States in connection with shipments of Prime Vendor goods under Prime Vendor Contracts entered between DLA and Anham and Valiant. In addition, they established that Maersk, as a USC Contracts carrier, was a designated third-party beneficiary under the Prime Vendor Contracts.

53.     Maersk performed all of its obligations under the USC-7 and USC-8 Contracts by delivering all of the goods ordered by the DLA to be shipped for Anham and Valiant under its Price Vendor Contracts.

54.     Nothing in the USC-7 and USC-8 Contracts required Maersk to absorb the costs of delay it suffered in delivering the goods as a result of the actions of others whom it did not control.

55.     Nothing in the USC-7 and USC-8 Contracts required Maersk to ascertain, pinpoint, and prove to the Government who was responsible for delays it suffered as a result of the actions of others whom it did not control as a precondition to payment for those costs.

56.     To the extent required by the USC-7 and USC-8 Contracts, Maersk carried out and exhausted its requirements under the PV Carrier Agreements with Anham and Valiant to ascertain who might be responsible for the delays suffered by Maersk.

57.     To the extent required by the USC-7 and USC-8 Contracts, Maersk exhausted its obligations to seek assistance from and to work with USTRANSCOM and DLA to facilitate a resolution of its delay and related claims while pending with Anham and Valiant.

17

58.     USTRANSCOM and DLA failed to provide the assistance required of them in assisting Maersk and the Prime Vendors resolve the delay charges.

59.     Maersk has satisfied all conditions precedent that might have been required of it and nothing more was required of Maersk under the USC-7 and USC-8 Contracts to seek and receive payment for the delay and related charges it suffered.

60.     Maersk was entitled under the USC-7 and USC-8 Contracts to submit claims to and be paid by USTRANSCOM for the delay and related charges it suffered without having to prove who in fact caused the delays.

61.     The failure of USTRANSCOM to pay Maersk for its delay charges or to assist Maersk in ascertaining who else might be responsible was in breach of its obligations under the USC-7 and USC-8 Contracts.

62.     The failure of DLA under its Prime Contracts to assist its Prime Vendors and Maersk in ensuring smooth transport of goods and in resolving the delay charges issues was a breach of its contract obligations owed to Maersk as a third party beneficiary, as was its  failure to address Maersk's claims for payment.

## COUNT 2
## DECLARATORY RELIEF

63.     Maersk incorporates each and all of the allegations set forth in paragraph 1-62 by refence as if they were set forth fully herein.

64.     USTRANSCOM and Maersk dispute whether Maersk is entitled to payment for the delay charges it suffered in performing its contract obligations under the USC-7 and the USC-8 Contracts.

65.     Maersk contends that USTRANSCOM breached its obligations to Maersk under the USC-7 Contract and the USC-8 Contract by: (i) failing to recognize that Maersk was not

required to pinpoint and prove the cause of and responsible party for the delay of movements of Anham and Valiant Prime Vendor Cargo under the USC Contracts or the PV Carrier Agreements, (ii) failing to recognize that Maersk was not required to absorb the costs of unanticipated delays not within the control of the Maersk as the carrier while cargo was being transported within the DTS pursuant to the USC-7 and USC-8 Contracts; and (iii) by hindering Maersk and failing to cooperate with and assist Maersk in its efforts to determine who was responsible for the delay and then failing to pay Maersk's delay cost under the USC Contracts.

66.     Maersk further contends that DLA breached its contract obligations to Maersk as a third-party beneficiary under the PV Contracts by hindering and failing to cooperate with and assist Maersk and its Prime Vendors in Maersk's efforts to determine who was responsible for the delay and costs it incurred in transporting the Prime Vendor Cargo.

67.     USTRANSCOM asserts that it has no legal or factual responsibility to assist Maersk in determining who was responsible for the delay costs it suffered and it has no responsibility to pay for any costs Maersk cannot prove were specifically attributable to the U.S. Government.

68.     There exists an actual case and controversy regarding the rights of the parties to these contracts for which Maersk seeks a declaration as to its right to recover the amounts claimed under the USC Contracts.

**COUNT 3**
**COMMON LAW BREACH OF CONTRACT**

69.     Maersk incorporates each and all of the allegations set forth in paragraph 1-68 by refence as if they were set forth fully herein.

70.     Maersk and USTRANSCOM entered into valid written contacts, namely the USC-7 and USC-8 Contracts, which established the conditions under which USTRANSCOM was to

pay Maersk for delivering goods of DLA Prime Vendors on orders placed with Maersk by the DLA in support of the Prime Vendor Contracts.

71.    Maersk fulfilled all of its contractual obligations and conditions precedent entitling it to payment under the USC Contracts.

72.    Nothing in USC Contracts required Maersk to absorb the costs of delay it suffered as a result of the actions of others whom it did not control.

73.    Nothing in the USC Contracts required Maersk to ascertain, pinpoint, and prove who was responsible for delays it suffered as a result of the actions of others whom it did not control.

74.    Maersk was entitled under the USC Contracts to submit claims for and be paid for delay costs it suffered in performing its contract duties.

75.    USTRANSCOM breached its contractual obligations to pay Maersk for its services, including for the delay costs it suffered, by failing to make payment.

76.    Maersk is entitled to payment of the amounts claimed under the USC-7 Contract and the USC-8 Contract as applied to the work it performed regarding Anham and Valiant.

## COUNT 4
### BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

77.    Maersk incorporates each and all of the allegations set forth in paragraph 1-76 by refence as if they were set forth fully herein.

78.    USTRANSCOM had an implied duty under the USC-7 and USC-8 Contracts not to hinder and to cooperate with and assist Maersk in its efforts to determine who was responsible for the delays to its shipments and that failing to pay Maersk's delay cost under the USC Contracts so that it might recover those costs to which it is entitled.

79.     DLA had an implied duty to Maersk, as a third-party beneficiary under the PV Contracts, not to hinder and to cooperate and assist Maersk and its Prime Vendor Contractors to determine who was responsible for the delay suffered by Maersk in its shipments of goods which DLA placed with Maersk for transportation for its Prime Vendor Contractors.

80.     Maersk fulfilled all of its obligations under the USC Contracts to USTRANSCOM and to Anham and Valiant under the PV Carrier Agreements, including exhausting the claims resolution process set forth in the PV Carrier Agreements.

81.     When Maersk sought assistance from USTRANSCOM, that agency sought unreasonably to avoid its obligations to cooperate with and assist Maersk in discovering which party had caused the delay to its shipments once the Prime Vendors determined it was not caused by them.

82.     Having instead pressed Maersk to contact DLA, USTRANSCOM unreasonably sought to avoid and slough off to DLA its obligations, instead of reaching out and pressing DLA to assist Maersk, and to itself work with DLA and Maersk.

83.     As a result, USTRANSCOM breached its duties of good faith and fair dealing owed to Maersk directly under the USC Contracts.

84.     DLA, having placed orders with Maersk to ship Prime Vendor goods under the USC-7 and USC-8 Contracts had an obligation to manage the process so as not to cause Maersk to suffer delays and to assist its Prime Vendor Contractors and Maersk as a third-party beneficiary to ascertain who had caused the delays and resulting costs suffered by Maersk.

85.     DLA's refusal to work with Maersk, dismissal of its efforts, and refusal to address its claims, despite direction from USTRANSCOM for Maersk to work with DLA to resolve the

delay costs situations breached its duties of good faith and fair dealing owed to Maersk as a third-party beneficiary under the PV Contracts.

86.    Having breached its duty to Maersk, it was error for USTRANSCOM to deny Maersk's claims under the USC Contracts and it was error for the DLA to refuse to address and respond to Maersk's claims.

## PRAYER FOR RELIEF

Wherefore, Maersk Line, Limited, respectfully requests that the Court conclude and enter Judgment in its favor and against the United States, as follows:

1.    USTRANSCOM breached its obligations to Maersk under contract number HTC711-12-D-W013 (the "USC-7 Contract") and Contract No. HTC711-16-D-W014 (the "USC-8 Contract") as to the Anham and Valiant claims by: (i) failing to recognize that Maersk was not required to pinpoint and prove the cause of and responsible party for the delay costs it suffered related to its transportation of Anham and Valiant Prime Vendor Cargo under the USC Contracts and the PV Carrier Agreements, (ii) failing to recognize that Maersk was not required to absorb the costs of unanticipated delays not within the control of the Maersk as the carrier while cargo was being transported within the DTS pursuant to the USC-7 and USC-8 Contracts; and, (iii) by hindering Maersk and failing to cooperate with and assist Maersk in its efforts to determine who was responsible for the delay and that failing to pay Maersk's the delay costs it suffered under the USC Contracts.

2.    DLA breached its contract obligations to Maersk as a third-party beneficiary under the PV Contracts by hindering and failing to cooperate with and assist Maersk and its Prime Vendors in Maersk's efforts to determine who was responsible for the delay and costs it incurred in transporting the Prime Vendor Cargo.

3.      Payment to Maersk in the amount of $387,629.29, pursuant to its claim under USTRANSCOM contract number HTC711-12-D-W013 (the "USC-7 Contract"), in connection with transportation services provided to Anham under shipping orders placed with it by DLA to transport supplies under Anham's DLA PV Contracts, plus CDA interest from December 22, 2020 through date of payment. 41 U.S.C. § 7109. *See also* 46 U.S.C. § 30911(Authorizing Court to award costs, and interest at the rate of four percent from date of action until payment is made except that if the claim is based on a contract providing for interest, interest may be awarded at the rate and for the period provided in the contract).

4.      Payment to Maersk in the amount of $748,402.32 pursuant to its claim under USTRANSCOM awarded Contract No. HTC711-16-D-W014 (the "USC-8 Contract"), in connection with transportation services provided to Anham under shipping orders placed with it by DLA to transport supplies under Anham's DLA PV Contracts, plus CDA interest from December 22, 2020 through date of payment. 41 U.S.C. § 7109.

5.      Payment to Maersk in the amount of $9,030.00 pursuant to its claim under USTRANSCOM awarded Contract No. HTC711-16-D-WO14 (the (USC-8 Contract"), in connection with transportation services provided to Valiant under shipping orders placed with it by DLA to transport supplies under Valiant's DLA PV Contracts, plus CDA interest from December 22, 2020 through date of payment. 41 U.S.C. § 7109.

6.      Payment to Maersk of $387,629.29 under the USC-7 Contract and of $748,402.32 and $9,030.00 under the USC-8 Contracts plus interest as allowed by law for USTRANSCOM's and / or DLA's breach of the duty of good faith and fair dealing owed to Maersk.

7.      Payment to Maersk of $387,629.29 under the USC-7 Contract and of $748,402.32 and $9,030.00 under the USC-8 Contract, plus interest as allowed by law for USTRANSCOM's and DLA's common law breach of contract.

8.      Maersk shall be entitled to recover its costs and interest from December 22, 2020 until date of payment on each of the three claims, pursuant to and at such rate as is authorized by the CDA. 41 U.S.C. § 7109. *See also* 46 U.S.C. § 30911(Authorizing Court to award costs, and interest at the rate of four percent from date of action until payment is made except that if the claim is based on a contract providing for interest, interest may be awarded at the rate and for the period provided in the contract).

9.      Maersk is authorized to seek recovery of its attorneys' fees, costs and expenses incurred as a result of these proceedings, as may be authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412, on the grounds that it has prevailed and the position of the United States was not substantially justified.

10.     Such other and further relief as the Court deems to be just and appropriate.

Respectfully submitted,

MAERSK LINE, LIMITED

Dated:  September 2, 2022                          By /s/ *Anthony H. Anikeeff*

Anthony H. Anikeeff (VSB# 20338)
WILLIAMS MULLEN, P.C.
8350 Broad Street
Suite 1600
Tysons, Virginia  22102
Phone: (703) 760-5206
Fax: (703) 748-0244
Email: aanikeeff@williamsmullen.com

*Attorney for Maersk Line, Limited*

24

Attachments to Complaint

<u>Attachment 1</u>: September 3, 2021 Contacting Officer's Final Decision Regarding Certified Claim, dated 22 December 2020; TCAQ-21-REA-0001; Contract HTC711-12-D-W013 -- Anham USC-7 Contract Claim

<u>Attachment 2</u>: September 3, 2021 Contracting Officer's Final Decision Regarding Certified Claim, dated 22 December 2020; TCAQ-21-REA-0002; Contract HTC711-16-D-W014 -- Anham USC-8 Contract Claim

<u>Attachment 3</u>: September 3, 2021 Contracting Officer's Final Decision Regarding Certified Claim, dated 25 March 2021; TCAQ-19-REA-0058; Contract HTC711-16-D-W014 – Valiant USC-8 Contract Claim

101033031.2